# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

|  |  |  |
|---|---|---|
| **ROY A. DYE,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:04CV00068 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | By: James P. Jones |
| **COMMISSIONER OF SOCIAL** | ) | Chief United States District Judge |
| **SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

In this social security case, I remand the case to the Commissioner for further proceedings.

## *I. Background.*

Roy A. Dye filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under titles II and XVI of the Social Security Act, 42 U.S.C.A. § 401-433, 1381-1383f (West 2003 & Supp. 2005). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g) and 1383(c)(3).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." (*Id.*)

Dye applied for benefits on July 5, 2000, alleging disability as of April 14, 1994, and received a hearing before an administrative law judge ("ALJ") on July 24, 2001. By decision dated August 15, 2001, the ALJ found that the plaintiff was not disabled within the meaning of the Act. The Appeals Council declined review on August 23, 2002. The plaintiff sought review in this court where his case was remanded to the Commissioner on April 9, 2003.

The ALJ convened a second administrative hearing on August 5, 2003, and heard the testimony of the plaintiff. A vocational expert ("VE") also testified at the hearing. The ALJ issued a decision on August 13, 2003, finding that the plaintiff retained the residual functional capacity to perform medium work that did not involve overhead lifting of the left arm. The ALJ found the plaintiff was not disabled within the meaning of the Act because the vocational expert identified various jobs existing

in significant numbers in the regional and national economies which the plaintiff could perform given his limitations.  The Appeals Council considered the plaintiff's objections to the ALJ's decision and denied his request for review.  Thus, the ALJ's August 13, 2003, opinion constitutes the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues.  The case is now ripe for decision.

## *II. Facts*.

The plaintiff was fifty-five years old at the time of the ALJ's most recent decision.  He has a seventh grade, limited education and past relevant work experience as a general laborer in the coal mines.

In regard to the plaintiff's alleged disability, the ALJ considered medical evidence and opinions of Samina Yousuf, M.D.; Dan Levesque, chiropractor; Robert W. Walker, M.D.; Roger D. Neal, M.D.; G.S. Kanwal, M.D.; and state agency physician, Robert O. McGuffin, M.D.

In a report dated May 19, 1998, chiropractor Dan Levesque noted examining the plaintiff on July 25, 1997, when he visited for an initial examination and evaluation of his symptoms. (R. at 115-20.) The plaintiff's dominant complaint was sharp, numbing, and tingling pain in the low back bilaterally and aching pain in his

left shoulder. (R. at 117.) The plaintiff indicated that he had not experienced prior symptoms similar to his current complaints. (*Id*.) At the examination, the plaintiff's superficial appearance suggested he was in distress. (*Id*.) Levesque found that Minor's Sign was present, which is usually indicative of sciatica. (*Id.*) The Low Back Hyperextension Test, a lumbar lesion test, was positive indicating L5 as the center of the pain. (*Id*.) A series of Intervertebral Disc Syndrome tests were performed including the Bowstring Sign and the Kemp's Test. (R. at 118.) The Bowstring Sign was present bilaterally indicating nerve root compression or a ruptured intervertebral disc. (*Id*.) The Kemp's Test was positive bilaterally meaning that the low back pain radiates into the lower extremity indicating possible facet syndrome, fracture or disc involvement. (*Id*.)

Levesque performed a series of upper extremity tests including the Codman's Sign, Cozen's Test, Hamilton's Ruler Test, and the Shoulder Compression Test. (*Id.*) The Codman's Sign was present on the left side indicating a rotator cuff tear. (*Id*.) The Cozen's Test was positive on the left side indicating tennis elbow, also known as epicondylitis or radiohumeral bursitis. (*Id*.) The Hamilton's Ruler Test was positive on the left side indicating a shoulder dislocation. (*Id*.) The Shoulder Compression Test was positive on the left side indicating coracoid pressure syndrome identical to a hyperabduction type of thoracic outlet syndrome. (R. at 119.) A

postural evaluation visual inspection revealed a head tilt on the left side, an elevation of the right shoulder, and a higher crest on the right side of the ilium. (*Id*.)

Levesque performed a palpation evaluation to evaluate the plaintiff's response to pressure and to examine tissue consistency. The trapezius trigger points evoked an audibilized pain response and the left trapezius trigger points disclosed significant edema. (*Id*.) Additional palpation noted that T2 and L5 were swollen and edematous on static palpation. (*Id*.) Taut and tender fibers were noted on all above levels. (*Id*.) Dual probe thermographic readings were noted at T2 and L5. (*Id*.) X rays available for review on July 25, 1998 included the cervical spine, thoracic spine, and the lumbar spine. The radiographic analysis of these X rays showed no evidence of fracture present. (*Id.*) The diagnosis was defined as vertebral subluxation complex present at T2 and L5. (R. at 120.) The activities of daily living assessment revealed that the plaintiff does suffer from losses of functional capacity including physical activity such as standing, sitting, walking, bending, lifting, climbing, and exercising. (*Id*.) The plaintiff was expected to do well with the completion of recommended treatment plan; however, he did not follow through with the plan and had not been treated since August 4, 1997. (*Id*.)

The plaintiff underwent a consultative examination by Dr. Samina Yousuf on September 30, 2000. (R. At 100-06.) He reported to Dr. Yousuf that he had

sustained coal mining injuries in 1979 and 1991 and had severe back pain. (R. at 100.) X rays of the lumbar spine were taken and showed no acute osseous abnormality or evidence of prior osseous trauma. (R. at 106.) Physical examination showed some limitation in range of motion of the dorsolumbar spine. (R. at 104.) There was a deformity of the left shoulder with decreased motor strength and limited range of motion (R. at 102.) Dr. Yousuf noted depression, insomnia, severe low back pain, constant left shoulder pain, inability to extend or abduct left shoulder, and diminished strength in left hand. (R. at 101.) The plaintiff had no point spinal tenderness, intact sensation, and normal reflexes. (R. at 102.) He had moderate low back tenderness. (*Id*.) Dr. Yousuf's examination showed that his lungs were clear to auscultation bilaterally with some diminished breath sounds, that he has no heart problems, no peripheral edema of the extremities, and normal pulses. (*Id*.) He had normal motor strength except in the left upper extremity. (*Id*.) Dr. Yousuf opined that the plaintiff has multiple medical problems including low back pain. (R. at 103.) Dr. Yousuf further stated that he had a left femur fracture, a rod in his left thigh, left shoulder deformity, and moderate pain in his left shoulder. (*Id*.)

Dr. Robert O. McGuffin, a state agency physician, completed a Physical Residual Functional Capacity Assessment on October 17, 2000. (R. at 107-14.) Dr. McGuffin noted pertinent findings from the plaintiff's physical examinations and

opined that he retained the capacity to occasionally lift/carry up to fifty pounds, frequently lift/carry up to twenty-five pounds, stand/walk with normal breaks for about six hours in an eight-hour workday, and sit with normal breaks for a total of about six hours in an eight-hour workday. (R. at 108.) Dr. McGuffin noted that the plaintiff did have a fractured left femur with a rod now in his left thigh and that he has a left shoulder deformity with decreased motor strength and limited range of motion. (R. at 109.) Dr. McGuffin also noted some tenderness in the lower back, but normal reflexes and strength in the lower extremities. (*Id*.) Dr. McGuffin opined that the plaintiff can never climb ladders, can frequently climb stairs, can occasionally stoop, and is limited in his ability to reach in all directions including overhead. (R. at 109-10.) Dr. McGuffin further opined that the plaintiff could perform light work that does not require overhead reaching with the left upper extremity. (R. at 112.)

Dr. Robert Walker was the plaintiff's treating physician from June 28, 2001, through June 16, 2003. (R. at 187-95.) At a complete check-up examination in June 2001, the plaintiff reported that he had basically been healthy most of his life. (R. at 194.) Following a complete examination, Dr. Walker assessed the plaintiff as having hypertension, heart palpitations (but with normal EKG), and left shoulder bursitis. He further noted that the plaintiff had a history of disc disease in the lumbosacral

spine, was status post left femur fracture with repair noted, and status post burns to face and hands. (R. at 195.)

X rays of the plaintiff's left shoulder and lumbar spine were taken in November 2001, at the discretion of Dr. G. S. Kanwal. These X rays showed no significant abnormalities in the left shoulder or in the lumbar spine. (R. at 213.)

Dr. Walker examined the plaintiff again in December 2001. Dr. Walker noted that the plaintiff had "no symptoms whatsoever" of hypertension, that his blood pressure was well-controlled with medication, and he was having headaches a few months ago with no headache at the present time. (R. at 193.) He also noted that the plaintiff's cardiac, pulmonary, and GI system review was normal. (*Id*.) The plaintiff had no complaints regarding his back or shoulder.

The plaintiff had another examination with Dr. Walker in June 2002 after he had recently been in the hospital because of chest pain. (R. at 192.) Dr. Walker noted that heart attack had been ruled out during that admission and the plaintiff's Cardiolite Thallium stress test did not show ischemia. (*Id*.) Since discharge, the plaintiff had been doing well with no chest pain. (*Id*.) Dr. Walker assessed the plaintiff as having atypical chest pain, hypertension, and probable GERD. (*Id*.) The plaintiff made no complaints to Dr. Walker about his back or shoulder. (*Id*.)

In a Medical Assessment of Ability to do Work-Related Activities (Physical), dated July 15, 2002, Dr. Walker opined that the plaintiff can lift/carry a maximum of five pounds occasionally, one pound frequently; can stand/walk a total of one hour in an eight-hour day, ten minutes without interruption; can sit a total of two hours in an eight-hour day, 15 minutes without interruption. (R. at 221-22.) Dr. Walker also felt that the plaintiff should never climb, stoop, kneel, balance, crouch, or crawl. (R. at 222.) Dr. Walker noted that reaching, handling, and push/pulling were affected by his impairment. (*Id.*) He also noted no environmental restrictions. (R. at 223.) Medical findings reported to support this assessment were arm pain, back pain, and right hand pain. (R. at 221-23.)

Plaintiff made another visit to Dr. Walker in December 2002 regarding the hypertension. (R. at 190.) Dr. Walker noted hypertension, questionable right thyroid nodule, and GERD. (*Id.*) Dr. Walker noted at an examination in June 2003 that the plaintiff was doing well and had no significant symptoms. (R. at 188.) Dr. Walker noted hypertension, unhealing lesion on the right posterior neck, and questionable thyroid nodule. (*Id.*) The plaintiff made no complaints about his back or shoulder. Another examination in December 2003 showed that the plaintiff was "doing well" and had "no complaints." (R. at 147.) Dr. Walker made another Medical Assessment

of Ability to do Work-Related Activities (Physical) on December 15, 2003, with the same findings as his July 2002 assessment. (R. at 149.)

Dr. Roger D. Neal treated the plaintiff from September 6, 2001 through March 27, 2003, due to trouble swallowing foods, high frequency hearing loss bilaterally, and thyroid nodule. (R. at 205-07.)

Dr. G.S. Kanwal treated the plaintiff from November 14, 2001, through November 16, 2001, due to left leg pain and left shoulder pain. (R. at 211-12.) Multiple view X rays taken of the left shoulder and lumbar spine showed no significant abnormalities in the left shoulder or in the lumbar spine. (R. at 213.)

The plaintiff received treatment at Johnston Memorial Hospital from May 31, 2002, through June 11, 2002, due to chest pain and a history of hypertension. (R. at 214-19.)

Based upon the evidence, the ALJ determined that although the plaintiff has an severe impairment or combination of impairments, those impairments do not meet or medically equal one of the listed impairments in the Act. Further, the ALJ determined that the plaintiff's allegations regarding his limitations are not totally credible, and that the plaintiff retains the residual functional capacity to perform medium work. Ultimately, the ALJ concluded that the plaintiff was not under a disability. In making this determination the ALJ relied on the testimony of the VE,

Donna M. Bardsley, who opined that given Dye's age, education, work experience, and residual functional capacity to perform medium work with no overhead reaching, there were various jobs existing in significant numbers in the regional and national economies that plaintiff could perform.

*III. Analysis.*

The plaintiff contends that the ALJ erred in determining the plaintiff is an individual closely approaching advanced age, in failing to give great weight to the opinion of the plaintiff's treating physician, in failing to provide good reasons for rejecting the opinion of the plaintiff's treating physician, in failing to address the plaintiff's insomnia and depression, and in failing to consider the combined effect of all the plaintiff's impairments on his ability to work. For the reasons stated below, I find that the plaintiff's last two arguments warrant remand of the case to the Commissioner for further consideration.

While the plaintiff is correct in his assertion that the ALJ erred in classifying him as an individual closely approaching advanced age, this does not entitle him to relief. In his opinion, the ALJ stated that "the claimant is currently 55 years old. This is defined in the regulations as a individual closely approaching advanced age." (R. at 164.) As plaintiff points out, however, the regulations provide that persons age

fifty to fifty-four are individuals closely approaching advanced age and that persons age fifty-five or older are individuals of advanced age. 20 C.F.R. § 404.1563 (d)-(e) (2005). Nonetheless, the ALJ's determination that the plaintiff was an individual approaching advanced age is harmless error given that a person with the plaintiff's limited education, unskilled previous work experience, and ability to perform medium work is considered not disabled by the grid rules for both an individual approaching advanced age and an individual of advanced age. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 3, grid rules 203.18 & 203.11 (2005). Furthermore, because Dye had the additional limitation of no overhead reaching, the ALJ considered the testimony of a VE rather than relying solely on the regulations.

Next, Dye claims that the ALJ erred both in failing to give great weight to the opinion of the plaintiff's treating physician, Dr. Walker, and in failing to provide good reasons for rejecting Dr. Walker's opinions. While the regulations provide that a treating source's opinion on the nature and severity of impairments will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, "[b]y negative implication, if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial

- 12 -

evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

Dr. Walker's assessments indicated that Dye could lift/carry only five pounds occasionally and one pound frequently, stand/walk for a total of one hour and only ten minutes without interruption, sit for a total of two hours and only fifteen minutes without interruption, and never climb, stoop, kneel, balance, crouch, or crawl. However, these findings are not supported by Dr. Walker's reported physical examinations and are inconsistent with other evidence of record. Notably, Dr. Walker's notes from office visits in both 2001 and 2002 indicate that the plaintiff had no complaints regarding his back or shoulder. (R. at 192, 193.) Again in June 2003, Dr. Walker noted that plaintiff was doing well and had no significant symptoms. (R. at 188.) In the same month in which Dr. Walker completed the functional assessment form, December 2003, he recorded in plaintiff's chart that plaintiff was "doing well" and had "no complaints." (R. at 147.) Furthermore, on the assessment form, Dr. Walker did not list any objective medical findings to support his conclusions, but rather stated only the subjective complaint of "back pain." (R. at 150.)

Additionally, the extreme limitation assessed by Dr. Walker contradicts the plaintiff's own statements about his functional abilities. While Dr. Walker opined that Dye could only lift one to five pounds, the plaintiff testified that he could

lift/carry twenty to twenty-five pounds normally and twenty pounds even on a bad day. (R. at 33-34.) Likewise, while Dr. Walker assessed that Dye was able to stand/walk for only ten minutes at a time for a total of only one hour in an eight-hour period, the plaintiff told the ALJ that he could stand and walk for a couple of hours before having any trouble. (R. at 33.) The record also reflects that the plaintiff performed activities such as yard work, cleaning, vacuuming, laundry, and repairs on a fairly regular basis. (R. at 30-31, 87-88.) Based on these facts, I find that the ALJ did not err in rejecting the unsupported position taken by Dr. Walker.

In his third argument, Dye contends that the ALJ ignored his alleged non-exertional limitations of insomnia and depression identified by Dr. Yousuf. (R. at 100-06.) As plaintiff points out, the Appeals Counsel remanded the case to the ALJ on the grounds that the prior decision failed to address Dye's strength limitations which impact his ability to perform medium work *and* also "did not specifically address the weight accorded the consultants opinions concerning non-exertional limitations." (R. at 172.) In his August 13, 2003, decision, the ALJ failed to consider non-exertional limitations before concluding that Dye was not disabled, despite Dr. Yousuf's notations indicating that Dye suffered from insomnia and depression that could potentially impact his ability to work. Admittedly, the plaintiff did indicate to the agency that he slept "O.K." without any medications and he never indicated in his

disability application or reports that he was depressed. Thus, it is possible that the ALJ concluded that, despite Dr. Yousuf's notes, that plaintiff's alleged insomnia and depression did not affect his ability to work and thus his residual functional capacity was not further affected by non-exertional limitations. Nonetheless, the ALJ's opinion does not address this issue, and "the ALJ has the duty to specifically refer to the evidence upon which he bases the framework of his decision." *Hill v. Comm'r of Soc. Sec.*, 49 F. Supp. 2d 865, 869 (S.D.W.Va. 1999). This "duty of explanation is an important part of the administrative charge." *Id*. As it is not clear whether the ALJ considered the potential non-exertional limitations, I find that substantial evidence does not support the Commissionerr's decision and accordingly, I remand this case for further administrative action.

In his final argument, plaintiff contends that by failing to evaluate the plaintiff's insomnia and depression, the ALJ failed to consider the combined effect of all of the plaintiff's impairments on his ability to work. While, as explained above, the ALJ may have found that the alleged insomnia and depression did not affect Dye's ability to work, the ALJ failed to address these potential impairments in his opinion and the case must therefore be remanded.

- 15 -

*IV. Conclusion.*

For the foregoing reasons, the parties' motions for summary judgment will be denied and the case will be remanded for further administrative consideration and development.

An appropriate final judgment will be entered.

                                 DATED: March 22, 2006

                                 /s/ JAMES P. JONES
                                 Chief United States District Judge